UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

                                CRIMINAL ACTION

VERSUS

                                NO. 22-93-JWD-RLB

JOHN I. DAVIS

<ins>RULING AND ORDER</ins>

This matter comes before the Court on the *Motion to Suppress* ("*MTS*") (Doc. 46) filed by Defendant John Davis ("Davis" or "Defendant"). The Government filed a *Response to Defendant's Motion to Suppress* ("*Opposition*"). (Doc. 59.) A hearing was held on September 3, 2025, regarding the *MTS*. (Doc. 141.) The parties then filed post-hearing briefs. (Docs. 144, 146.) The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendant's *MTS* is denied.

I.    **BACKGROUND**

Defendant was previously convicted of, *inter alia*, Conspiracy to Possess with Intent to Distribute Five or More Kilograms of Cocaine and Possession with Intent to Distribute Five or More Kilograms of Cocaine—both felonies. (Doc. 12 at 4.)

In March 2021, narcotics agents with the East Baton Rouge Sheriff's Office ("EBRSO") were alerted that Defendant and his girlfriend, Madelyn E. Payne ("Payne"), were allegedly distributing narcotics (namely, heroin) in the Baton Rouge area. (Doc. 59 at 1.) At the time, the pair primarily resided at 2232 Gentlebrook Drive, Baton Rouge, Louisiana ("the Gentlebrook residence")—located in East Baton Rouge Parish. (*Id.*; Doc. 144 at 1.) After observing Defendant and Payne engage in what appeared to be "narcotics transactions" on March 25, 2021, EBRSO agents set up a controlled purchase (of heroin) from the pair. (Doc. 59 at 2.) A confidential informant completed that controlled purchase on March 29, 2021. (*Id.*) Following that transaction,

1

Defendant and Payne returned to the Gentlebrook residence. (*Id.*) On March 30, 2021, EBRSO agents again observed them engage in what appeared to be narcotics transactions, including in Livingston Parish. (*Id.* at 2–3; *see also* Doc. 144 at 1.)

Using GPS data and phone pings, agents determined that, on April 3, 2021, Defendant had traveled to 19881 Stone Hill Drive, Denham Springs, Louisiana ("the Stone Hill residence")— located in Livingston Parish. (Doc. 59 at 3; *see also* Doc. 144 at 1–2 (citing Doc. 143 at 17, 38).) Defendant's "estranged wife and [two] minor children" lived at that address. (Doc. 144 at 1.) According to the Government, agents had "deemed [the Stone Hill residence] a pertinent address" because Defendant had previously told the United States Probation and Pretrial Services Office that he resided there. (Doc. 59 at 3; Doc. 143 at 17.) Additionally, Defendant "made frequent stops" at the Stone Hill residence, including "at odd hours of the night." (Doc. 59 at 3; *see* Doc. 144 at 2 ("[Defendant] occasionally stayed overnight and visited at unusual hours."); Doc. 143 at 17 (noting that Defendant stopped at the Stone Hill residence at "odd-ball hours" (e.g., 11:00 p.m. until 5:00 a.m.)).) GPS data and phone pings also revealed that, when traveling to Livingston Parish, Defendant made "numerous brief stops indicative of narcotics trafficking." (Doc. 59 at 3.) However, "no officer or informant ever observed drugs, drug transactions, or related activity at or near the Stone Hill residence." (Doc. 144 at 2 (citing Doc. 143 at 20, 39).)

On April 7, 2021, agents set up—and a confidential informant completed—a second controlled purchase (again, of heroin) from Defendant. (Doc. 59 at 3–4; *see also* Doc. 144 at 1.) On April 9, agents obtained a search warrant for the Gentlebrook residence, which they executed on April 13. (Doc. 59 at 4; *see also* Doc. 144 at 2; Doc. 46-2 at 1.) During that search, they found, *inter alia*, heroin, drug paraphernalia, and $40,592 in cash. (Doc. 59 at 4; *see also* Doc. 143 at 19– 20, 44.) GPS data and phone pings placed the Defendant at the Stone Hill residence during the

search of the Gentlebrook residence. (Doc. 59 at 4–5; *see also* Doc. 144 at 2 ("A search warrant was executed at [the Gentlebrook residence] while Defendant was absent . . . .").) EBRSO narcotics agent Chad Felps ("Felps") relayed the results of the search to Livingston Parish Sheriff's Office ("LPSO") narcotics agent Jeff Scroggins ("Scroggins").[1] (Doc. 46-2 at 1.)

LPSO agents saw Defendant exiting the Stone Hill residence around this time and took him into custody. (Doc. 59 at 5.) Defendant's ex-wife then advised that Defendant "had recently brought a pistol into the residence." (*Id.*) She showed agents where it was hidden. (*Id.*; *see* Doc. 143 at 46–47.) After retrieving the pistol, agents obtained a search warrant for the Stone Hill residence ("the Stone Hill warrant") and for Defendant's red Chevrolet truck, which was parked on the premises. (Doc. 148 at 2, 4). Scroggins made the affidavit in support of the application for the Stone Hill warrant. (*Id.* at 1.) While searching Defendant's truck, agents found a second firearm and $4,120 in cash. (Doc. 59 at 5; *see also* Doc. 144 at 2.) On October 26, 2021, Defendant was indicted by a federal grand jury for, *inter alia*, one count of Possession of Firearms by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1). (Doc. 1 at 1–2.) He was arrested on the federal charges on December 22, 2022. (Doc. 23 at 1.)

### A.  The Stone Hill Warrant (Doc. 148)

The Stone Hill warrant—signed by Judge Erika Sledge—authorized the search of the Stone Hill residence, including its curtilage and any "vehicles, persons, and . . . movables on said curtilage." (Doc. 148 at 2.) The warrant described the location and appearance of the residence, as well as Defendant's truck. (*Id.*) It also specified the evidence that LPSO agents expected to find, including "controlled dangerous substance[s]" (*viz.*, heroin), currency, and firearms. (*Id.* at 1.)

---

[1] Defendant's *MTS* sometimes confuses the Stone Hill residence with the Gentlebrook residence—and Scroggins with Felps. (*See* Doc. 46-2 at 1–2.) The Court has made the appropriate substitutions.

In support of the application for the Stone Hill warrant, Scroggins explained that Felps had informed LPSO agents that EBRSO counterparts were investigating Defendant and had, "[w]ithin the past three weeks," completed two controlled purchases from Defendant. (*Id.* at 4.) Scroggins added that Defendant "was observed to perform several hand-to-hand narcotic[s] transactions" in Livingston and East Baton Rouge Parishes. (*Id.*) He swore that "[o]n multiple occasions during the investigation," Defendant traveled to the Stone Hill residence "after completing the narcotic[s] transactions." (*Id.*) Defendant "even spent the night" there. (*Id.*) Scroggins averred that the Stone Hill residence was "one of at least three residences . . . where Agents believe[d] [Defendant] store[d] narcotics and[/]or proceeds." (*Id.*) He opined that "it is common for illicit drug dealers to utilize numerous residences/locations to store their narcotics and proceeds to elude law enforcement." (*Id.* (cleaned up).)

Scroggins also mentioned that EBRSO agents had searched the Gentlebrook residence and had seized heroin and a large amount of cash. (*Id.*) After learning from EBRSO agents that Defendant was at the Stone Hill residence, LPSO agents began surveilling it, at which time they saw Defendant's vehicle "parked in the driveway." (*Id.*) Scroggins noted that, after LPSO agents took Defendant into custody, Defendant's ex-wife "advised that [Defendant] [had] recently brought a pistol to the residence." (*Id.*) She then "led Agents to a hidden room . . . where Agents observed a pink handgun." (*Id.*)

## II.   PARTIES' ARGUMENTS

### A.   Initial Briefs

#### 1.   *Defendant's MTS (Doc. 46)*

According to Defendant, "[t]here [wa]s no direct information from any source" that there was ever any contraband at the Stone Hill residence. (Doc. 46-2 at 1.) Rather, Defendant says, the

basis of the Stone Hill warrant was that Defendant "ha[d] been known to visit and occasionally spend the night at that location." (*Id.*) Defendant also asserts that another "significant basis" was Scroggins's "unsupported[,] conclusory statement that 'it is common for illicit drug dealers to utilize numerous residences/locations to store their narcotics and proceeds.'" (*Id.* at 1–2 (quoting Doc. 148 at 4 (cleaned up)).)

Defendant explains that a search warrant must be based on probable cause, (*id.* at 2 (citing *Nathanson v. United States*, 290 U.S. 41, 47 (1933))), which exists "where the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed," (*id.* (quoting *United States v. Rich*, 407 F.2d 934, 936 (5th Cir. 1969))). Defendant argues that Scroggins's affidavit was not reasonably trustworthy. (*Id.*) Rather, LPSO agents were "trying to shoehorn" the search of the Stone Hill residence into the search of the Gentlebrook residence. (*Id.*) Other than the two firearms, there was no contraband at the Stone Hill residence. (*Id.*) And "[a]t no time," Defendant says, did LPSO agents suggest that they expected to find firearms at the residence. (*Id.*)

### 2. *Government's Opposition (Doc. 59)*

The Government notes that Defendant "has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." (Doc. 59 at 5 (quoting *United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir. 1993)).) And for a *Franks* hearing, Defendant must "make[] a preliminary showing that '(1) allegations in a supporting affidavit were deliberate falsehoods or made with a reckless disregard for the truth, and (2) the remaining portion of the affidavit is not sufficient to support a finding of probable cause.'" (*Id.* at 6 (quoting *United States v. Brown*, 298 F.3d 392, 395 (5th Cir. 2002) (citing *Franks v.*

*Delaware*, 438 U.S. 154, 171 (1978)))).) The Government argues that Defendant "has not even alleged deliberate falsehoods or statements made with a reckless disregard for the truth in the affidavit, much less made the requisite preliminary showing of such." (*Id.*)

Secondarily, the Government contends that, even if the Stone Hill warrant is defective, then "the good faith exception [to] the exclusionary rule applies." (*Id.* (citing, *inter alia*, *United States v. Pigrum*, 922 F.2d 249, 252 (5th Cir. 1991)).) According to the Government, Defendant has asserted that Scroggins's affidavit was not reasonably trustworthy, but he has not "alleged, much less offered evidence of, a lack of good faith." (*Id.* at 7.) For its part, the Government believes that there was a sufficient nexus between the Stone Hill residence and the evidence sought. (*Id.* at 7 (citing *United States v. Gallegos*, 239 F. App'x 890, 895 (5th Cir. 2007)).) Specifically, Scroggins's affidavit "reference[d] [D]efendant's drug dealing in both East Baton Rouge Parish and Livingston Parish and his travel on multiple occasions to [the Stone Hill residence] after narcotics transactions." (*Id.* at 7–8.) The Government adds that the fact that a search did not produce the expected contraband "has no bearing on probable cause for the issuance of [a] warrant." (*Id.* at 8.)

**B. Suppression Hearing**

At the hearing on September 3, 2025, the Court first heard argument about whether Defendant had made the requisite showing of entitlement to a *Franks* hearing. (Doc. 143 at 3–4.) Defendant contended that Scroggins's affidavit included "some conclusory statements" but also "some false statements," such that a *Franks* hearing was necessary. (*Id.* at 4.) Specifically, Defendant claimed that Scroggins "misled" Judge Sledge, (*id.* at 7), via: (1) statements regarding the two controlled purchases by EBRSO agents, (*see id.* at 5–6 ("[LPSO] was not involved in that case whatsoever."), and (2) statements suggesting that Defendant was storing narcotics at the Stone Hill residence, (*see id.* at 6–7 ("[N]obody can establish . . . probable cause that there were drugs

6

that were stored or contained at that residence . . . .")). Defendant averred that, without such statements, the affidavit did not establish probable cause. (*Id.* at 7.) "Out of an abundance of caution, and since all parties were prepared to call witnesses, the Court allowed the *Franks* hearing to proceed." (Doc. 141 at 1; Doc. 143 at 7–8.)

Felps testified first. (Doc. 143 at 8.) He explained that, while LPSO agents "were not at the scene" of the first controlled purchase from Defendant, they "were in position to do surveillance in the event that [Defendant] crossed the parish line" and were otherwise "dedicated" to EBRSO's investigation. (*Id.* at 12–13.) For example, after the first controlled purchase, EBRSO agents followed Defendant across parish lines, at which time they "called [LPSO agents] to join . . . in the surveillance." (*Id.* at 15.) Likewise, no LPSO agents were present for the second controlled purchase, but they were in contact with EBRSO agents. (*Id.* at 13, 24.) In fact, communication between LPSO and EBRSO was "constant during the entirety of the investigation." (*Id.* at 26.)

Felps further testified that GPS data and phone pings indicated that Defendant visited the Stone Hill residence "periodically" during agents' month-long investigation.[2] (*Id.* at 16.) Defendant even stayed at the residence overnight on April 3—after making a number of stops that appeared to be narcotics transactions. (*Id.* at 16, 25–26.) Felps admitted that agents did not know what, exactly, Defendant was doing in Livingston Parish. (*Id.* at 16.) He also acknowledged that Defendant's ex-wife and two minor children lived at the Stone Hill residence. (*Id.* at 17–18.) But Felps noted that Defendant traveled to the residence at "odd-ball hours." (*Id.*) He opined that the unusual hours and Defendant's "travel pattern"—that is, the places where Defendant stopped before or after visiting—indicated that Defendant was using the Stone Hill residence as a "stash

---

[2] Agents also personally observed Defendant's truck parked at the Stone Hill residence on at least one occasion. (Doc. 143 at 18–19.)

location." (*Id.* at 25.) Felps conceded, though, that he did not think that he personally had "probable cause to believe that there were any drugs at the home." (*See id.* at 18, 22–23.)

Lastly, Felps stated that, at the time when EBRSO agents searched the Gentlebrook residence and obtained an arrest warrant for Defendant, LPSO agents were actively "participating in th[e] operation." (*Id.* at 20.) Specifically, on April 13, LPSO agents "began surveillance" at the Stone Hill residence in order "to take [Defendant] into custody." (*Id.*) Felps conveyed the results of the search of the Gentlebrook residence to LPSO agents. (*Id.* at 26–27.)

Scroggins testified that, based on his communications with Felps regarding the investigation into Defendant—as well as his remote participation in the two controlled purchases—he believed that Defendant might be storing narcotics at the Stone Hill residence. (*Id.* at 36–38.) He acknowledged that no LPSO agent saw or heard about any narcotics at the residence. (*Id.* at 39.) But he opined that "it's common practice" for drug dealers to use multiple stash houses. (*Id.* at 41, 45–46.) Scroggins also testified that Defendant used his truck "during the entirety of th[e] investigation." (*Id.* at 45.) Finally, Scroggins recounted how Defendant's ex-wife advised LPSO agents that Defendant had brought a firearm into the Stone Hill residence. (*Id.* at 46–47.) According to Scroggins, she showed LPSO agents where the firearm was hidden and "gave [them] permission to search the house." (*Id.*) Scroggins and other LPSO agents retrieved the firearm but, "out of an abundance of caution," waited until they obtained a warrant to search the residence and Defendant's truck. (*Id.* at 47.) Scroggins knew that Defendant had a prior felony conviction. (*Id.*)

### C. Post-Hearing Briefs

#### 1. *Defendant's Post-Hearing Brief (Doc. 144)*

In his post-hearing brief, Defendant again argues that all evidence obtained from the search of the Stone Hill residence should be suppressed because the Stone Hill warrant lacked probable

cause. (Doc. 144 at 1.) Specifically, Defendant contends that there was not a sufficient nexus "between the alleged criminal activity and the location searched." (*Id.*) According to Defendant, Scroggins's affidavit in support of the Stone Hill warrant "consisted of observations of general drug dealing" in East Baton Rouge and Livingston Parishes, but it did not specifically connect such activity to the Stone Hill residence. (*Id.* at 2.) Instead, it relied upon "a conclusory statement that 'it is common for illicit drug dealers to utilize numerous residences to store their narcotics and proceeds.'" (*Id.* (quoting Doc. 148 at 4 (cleaned up)).) Defendant emphasizes that agents did not find any drugs at the Stone Hill residence. (*Id.*)

Defendant explains that "[p]robable cause exists under a 'totality of the circumstances' analysis, requiring a 'practical, common-sense' determination that there is a fair probability [that] evidence of a crime will be found in the specified location." (*Id.* at 3 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).) "[T]here must be a 'nexus' between the alleged criminal activity and the place to be searched," requiring more than "mere suspicion or generalized assumptions." (*Id.* (citing *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978)).) Defendant argues that Scroggins's affidavit did not establish a nexus between Defendant's alleged drug-dealing and his visits to the Stone Hill residence. (*Id.*) Defendant insists that such visits, "even at unusual times, were innocuous and consistent with familial obligations." (*Id.*) He adds that "[n]o drugs, paraphernalia, or proceeds were observed at the site." (*Id.*) Thus, Defendant says, there was no probable cause for a search. (*Id.* (citing *United States v. Wilson*, 153 F.4th 478 (5th Cir. 2025)); *see also id.* at 4 (citing *United States v. Fields*, 182 F. Supp. 2d 575, 578–79 (E.D. Tex. 2002)); *United States v. McPhearson*, 469 F.3d 518, 524–25 (6th Cir. 2006)).)

Defendant also notes that the good-faith exception to the probable cause requirement "does not apply to 'bare bones' affidavits." (*Id.* (citing *United States v. Leon*, 468 U.S. 897, 922 (1984);

9

*Nathanson*, 290 U.S. at 47).) He contends that Scroggins's affidavit "was bare bones, resting on a generic, conclusory statement about drug dealers' habits despite [Scroggins's] knowledge that no drug activity was observed at the Stone Hill Residence." (*Id.*) According to Defendant, "[s]uch boilerplate language, untethered to specific facts, negates good faith." (*Id.* at 4–5 (citing, *inter alia*, *Wilson*, 153 F.4th 478; *Leon*, 468 U.S. at 923).) Finally, Defendant argues that the "vehicle search" exception does not apply to the instant case because he was "arrested in the driveway without incident . . . and secured before the search," and because there was no "reasonable belief that the truck contained evidence of drug distribution." (*Id.* at 5 (citing *Arizona v. Gant*, 556 U.S. 332, 343 (2009)).) Defendant therefore urges the Court to suppress the firearm as fruit of the poisonous tree. (*Id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).)

### 2. *Government's Post-Hearing Brief (Doc. 146)*

The Government reiterates that, because law enforcement obtained a search warrant, Defendant "must 'at least allege particular facts which would tend to indicate some government impropriety.'" (*Id.* at 1–2 (quoting *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977)) (citing *Kelley*, 981 F.2d at 1467).) More specifically, Defendant must show that: "(1) allegations in [the] supporting affidavit were deliberate falsehoods or made with a reckless disregard for the truth, and (2) the remaining portion of the affidavit is not sufficient to support a finding of probable cause." (*Id.* at 2 (quoting *Brown*, 298 F.3d at 395 (citing *Franks*, 438 U.S. at 171)).)

According to the Government, Defendant's theory at the suppression hearing was that Scroggins "knew that there was a falsehood in the affidavit itself" and that he "misled the court." (*Id.* (quoting Doc. 143 at 4, 7).) The Court "was skeptical that [Defendant] had overcome his initial [*Franks*] burden but decided to 'play it safe' and allow [Defendant] to proceed under a *Franks* theory." (*Id.* at 2–3 (quoting Doc. 143 at 7–8).) Now, the Government observes, Defendant "does

10

not mention *Franks*" or "allege any deliberate falsehoods or statements made with a reckless disregard for the truth in the affidavit." (*Id.* at 3.) Thus, the Government argues, the Court should "deny any relief to [Defendant] under *Franks*." (*Id.*)

The Government also contends, however, that the good-faith exception applies here. (*Id.* at 3–4 (citing, *inter alia*, *United States v. Norman*, 129 F.4th 874, 876 (5th Cir. 2025)).) It notes that "[a]n affidavit is bare bones only if it is 'completely devoid' of facts from which a [judge] can make an independent determination of probable cause." (*Id.* at 3 (quoting *United States v. Devaney*, 109 F.4th 322, 326 (5th Cir. 2024)).) But here, the Government says, Scroggins's affidavit "reference[d] [D]efendant's drug dealing in both East Baton Rouge Parish and Livingston Parish and his travel on multiple occasions to [the Stone Hill residence] *after narcotics transactions*." (*Id.* at 4 (emphasis added) (citing *Norman*, 129 F.4th at 876–77).) The affidavit also stated that the Stone Hill residence was "one of at least three residences involved where Agents believe[d] [Defendant] store[d] narcotics and[/]or proceeds." (*Id.* (quoting Doc. 148 at 4).) Only then did Scroggins's affidavit posit that "it is common for illicit drug dealers to utilize numerous residence[s]/locations to store their narcotics and proceeds to elude law enforcement." (*Id.* (quoting Doc. 148 at 4 (cleaned up)).)

The Government argues that the fact that Defendant visited the Stone Hill residence immediately after drug deals—combined with Scroggins's inferences—"makes the affidavit much more than bare bones." (*Id.* (citing *United States v. Bell*, 832 F. App'x 298, 301–02 (5th Cir. 2020) (per curiam)).) It disputes the framing of Defendant's brief, asserting that the proper inquiry is whether an officer "objectively could reasonably believe that there was . . . a nexus." (*Id.* at 4–5 (quoting *Norman*, 129 F.4th at 876).) Judges "are entitled to draw their own inferences from the facts in an affidavit." (*Id.* at 5 (citing *United States v. Robinson*, 741 F.3d 588, 597 (5th Cir. 2014)).)

11

The Government implies that Judge Sledge had "sufficient facts" to "make an independent probable-cause determination." (*Id.*)

## III.    LEGAL STANDARD

"The Fourth Amendment requires that search warrants be issued only 'upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'" *Dalia v. United States*, 441 U.S. 238, 255 (1979) (quoting U.S. Const. amend. IV). This language is "precise and clear." *Id.* (quoting *Stanford v. Texas*, 379 U.S. 476, 481 (1965)). It requires "three things": (1) "[W]arrants must be issued by neutral, disinterested [judges]." *Id.* (citing, *inter alia*, *Connally v. Georgia*, 429 U.S. 245, 250–51 (1977) (per curiam)). (2) "[T]hose seeking the warrant must demonstrate to the [issuing judge] their probable cause to believe that 'the evidence sought will aid in a particular apprehension or conviction' for a particular offense." *Id.* (quoting *Warden v. Hayden*, 387 U.S. 294, 307 (1967)). And (3) "warrants must particularly describe the 'things to be seized'" and the "place[s] to be searched." *Id.* (quoting *Stanford*, 379 U.S. at 485); *see also United States v. Morton*, 46 F.4th 331, 336 (5th Cir. 2022) (en banc) (citing *Leon*, 468 U.S. at 923; *United States v. Triplett*, 684 F.3d 500, 504 (5th Cir. 2012)) (specifying four instances in which reliance upon a warrant is unreasonable). "The proponent of a motion to suppress has the burden of proving, by a preponderance of evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992).

### A.    Good-Faith Exception

#### 1.    *Bare-Bones Affidavit & Insufficient Nexus*

"Deference to the judge issuing the warrant and the exclusionary rule's focus on deterring police misconduct results in the good-faith exception to the suppression remedy . . . ." *Morton*, 46

F.4th at 336. Per the exception, the fruits of a search are admissible if "obtained by law enforcement officers acting in objectively reasonable reliance on a search warrant issued by a detached and neutral [judge]." *Pigrum*, 922 F.2d at 252. This applies even where "the affidavit on which the warrant was based is insufficient to establish probable cause." *Id.* (citing, *inter alia*, *Leon*, 468 U.S. at 927–28 (Blackmun, J., concurring)). Of course, a warrant application must still be "supported by more than a 'bare bones affidavit.'" *Id.* (citing *United States v. Maggitt*, 778 F.2d 1029, 1035 (1985)). That is, "the affidavit must [still] provide 'the [issuing judge] with facts, and not mere conclusions, from which [s]he could determine probable cause.'" *Gallegos*, 239 F. App'x at 894 (quoting *United States v. Satterwhite*, 980 F.2d 317, 321 (5th Cir. 1992)).

Relatedly, in order for the good-faith exception to apply, "[t]he affidavit must establish a nexus between the [place] to be searched and the evidence sought." *Id.* at 895 (quoting *United States v. Freeman*, 685 F.2d 942, 949 (5th Cir. 1982)). "That nexus may be established . . . by direct observation *or* through normal inferences as to where the articles sought would be located." *Id.* at 895–96 (emphasis added) (citing, *inter alia*, *Freeman*, 685 F.2d at 949). "Under the good-faith exception, the question becomes 'whether officers objectively could reasonably believe that there was such a nexus.'" *Wilson*, 153 F.4th at 485 (quoting *Norman*, 129 F.4th at 876 (quoting *Bell*, 832 F. App'x at 301)).

### 2.  *Misleading Statements & Omissions*

Courts "will not uphold an officer's good faith reliance on a warrant if the issuing judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Gallegos*, 239 F. App'x at 894–95 (cleaned up) (quoting *United States v. Gibbs*, 421 F.3d 352, 358 (5th Cir. 2005) (quoting *Leon*, 468 U.S. at 923)). Omissions of material information can be misleading. *See, e.g.*, *United States v. Tomblin*,

46 F.3d 1369, 1377 (5th Cir. 1995); *United States v. Arispe*, 328 F. App'x 905, 907 (5th Cir. 2009) (per curiam). When considering whether an affiant—by statement or omission—misled the issuing judge, courts apply the *Franks* standard. *Gallegos*, 239 F. App'x at 895 (citing *United States v. Mays*, 466 F.3d 335, 343 (5th Cir. 2006)).

"There is . . . a presumption of validity with respect to the affidavit supporting [a] search warrant." *Franks*, 438 U.S. at 171. Thus, *Franks* sets a rather high bar: A defendant must show that "(1) allegations in a supporting affidavit were deliberate falsehoods or made with a reckless disregard for the truth, and (2) the remaining portion of the affidavit is not sufficient to support a finding of probable cause." *Brown*, 298 F.3d at 395 (citing *United States v. Dickey*, 102 F.3d 157, 161–62 (5th Cir. 1996)). Where the Fourth Amendment requires probable cause, "the obvious assumption is that there will be a *truthful* showing" of facts. *Franks*, 438 U.S. at 164–65 (quoting *United States v. Halsey*, 257 F. Supp. 1002, 1005 (S.D.N.Y. 1966)). "Truthful" does not, however, mean "that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay . . . as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." *Id.* at 165. Instead, "truthful" means "that the information put forth is believed or appropriately accepted by the affiant as true." *Id.*

## B. Probable Cause

"Probable cause is deemed to exist 'where the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a [person] of reasonable caution to believe that an offense has been or is being committed.'" *Rich*, 407 F.2d at 936 (quoting *Berger v. New York*, 388 U.S. 41, 55 (1967)). "Mere affirmance of belief or suspicion is not enough." *Nathanson*, 290 U.S. at 47.

"Because a search warrant provides the detached scrutiny of a neutral [judge], which is a

more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime, . . . [the Supreme Court has] expressed a strong preference for warrants and declared that in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." *Leon*, 468 U.S. at 913–14 (cleaned up). "Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and [the Court has] thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to [the issuing judge's] determination." *Id.* at 914 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)); *accord Rich*, 407 F.2d at 936. Thus:

> The task of the issuing [judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before h[er], including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Gates*, 462 U.S. at 238–39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

## IV. ANALYSIS

### A. Good-Faith Exception

#### 1. *Bare-Bones Affidavit & Insufficient Nexus*

Defendant argues that Scroggins's affidavit (1) was bare-bones and (2) did not create a sufficient nexus between the Stone Hill residence and the narcotics which LPSO agents expected to—but did not—find there. (Doc. 144 at 3–5.) Defendant is correct, of course, that a person's alleged drug dealing does not, *ipso facto*, "create a nexus to search [his] residence without additional evidence of ongoing activity there." (*Id.* at 4 (citing *McPhearson*, 469 F.3d at 524–25)); *see also Freeman*, 685 F.2d at 949 ("[T]he fact that there is probable cause to believe that a person

has committed a crime does not automatically give the police probable cause to search his house for evidence of that crime."). "[T]he Constitution demands a factual bridge" between a person's alleged criminal activities and a particular place to be searched. *Wilson*, 153 F.4th at 485. Courts have therefore "deemed affidavits bare bones when they 'provided no information linking the [criminal] investigation to [the defendant's] residence.'" *Id.* at 486 (quoting *United States v. Brown*, 567 F. App'x 272, 282 (5th Cir. 2014)).

In *United States v. Bell*, the Fifth Circuit vacated the district court's order suppressing evidence seized during a search of the defendant's home. *Bell*, 832 F. App'x at 301–02. There, the court explained:

> [I]n cases running the gamut from large conspiracies to small-quantity user-level deals, we have consistently concluded that . . . a combination of observations connecting a defendant's drug trafficking to a particular location and inferences regarding the tendencies of drug traffickers to keep contraband in their residences makes an affidavit more than "bare bones."

*Id.* at 302 (citing, *inter alia*, *United States v. Fields*, 380 F. App'x 400, 403–04 (5th Cir. 2010) (per curiam)).

Crucially, the Fifth Circuit's summary of the *Bell* affidavit bears a striking resemblance to the affidavit in the instant case:

> The affidavit noted that Bell had sold drugs to an undercover officer on three occasions. It identified that Bell drove two cars as he went about those sales—both of which were later seen outside the Residence. It noted that, according to arrest records, the Residence was Bell's last known address. Perhaps most significantly, it stated that Bell proceeded directly from the Residence to a drug sale after he was called to arrange a transaction. These observations were coupled with inferences, drawn from [the affiant's] training and experience, that individuals involved in the drug trade often keep contraband in their residences. Given these observations and inferences, the state court could reasonably conclude that there were likely drugs and other contraband at the Residence. The officers could therefore rely on the warrant they received in good faith.

*Id.* at 301–02.

Here, Scroggins's affidavit noted that Defendant "was observed to perform several hand-to-hand narcotic[s] transactions throughout Livingston and East Baton Rouge Parish[es]." (Doc. 148 at 4.) "[A]fter completing [these] transactions," Defendant would sometimes travel to the Stone Hill residence, "the home of [his] ex-wife."[3] (*Id.*) Defendant spent the night at the residence on at least one of these occasions. (*Id.*) Additionally, around the time of the search of the Gentlebrook residence, LPSO agents saw Defendant's truck "parked in the driveway" of the Stone Hill residence.[4] (*Id.*) They also saw Defendant himself. (*Id.*) After taking him into custody, LPSO agents learned from Defendant's ex-wife that Defendant had "recently brought a pistol to the residence." (*Id.*) She even "led Agents to a hidden room . . . where [they] observed a pink handgun" alleged to belong to Defendant. (*Id.*) Based on these facts, LPSO agents requested the Stone Hill warrant, indicating that they expected to find, *inter alia*, narcotics, currency, and/or firearms in the residence itself or on its curtilage, including in Defendant's truck. (*Id.* at 1–2.) Lastly, Scroggins stated that LPSO agents "believe[d]" that Defendant was storing "narcotics and[/]or proceeds" at the Stone Hill residence. (*Id.* at 4.) He gave his opinion—impliedly based on his experience—that "it is common for illicit drug dealers to utilize numerous residences/locations to store their narcotics and proceeds to elude law enforcement." (*Id.* (cleaned up); *see also* Doc. 143 at 44–45.)

These are more than mere "observations of general drug dealing" coupled with a "conclusory statement" about drug dealers' typically using multiple stash houses. (*Cf.* Doc. 144 at 2.) That is, Scroggins's affidavit contained "facts, and not mere conclusions, from which [Judge

---

[3] Although Scroggins did not include this detail in the affidavit, agents were also aware that Defendant visited the Stone Hill residence at "odd-ball hours." (Doc. 148 at 17; *see also* Doc. 144 at 2 ("[Defendant] occasionally stayed overnight and visited at unusual hours.").)

[4] Again, although Scroggins did not include this detail in the affidavit, he knew the red Chevrolet truck "to be the vehicle that [Defendant] utilized during the entirety of th[e] investigation." (Doc. 143 at 45.)

Sledge] could determine probable cause."[5] *See Gallegos*, 239 F. App'x at 894 (quoting *Satterwhite*, 980 F.2d at 321). And given these facts and Judge Sledge's determination, (*see* Doc. 148 at 1, 4), officers "objectively could reasonably believe that there was . . . a nexus" between Defendant's alleged drug dealing and the Stone Hill residence, *see Wilson*, 153 F.4th at 485 (quoting *Norman*, 129 F.4th at 876 (quoting *Bell*, 832 F. App'x at 301)); *see also Bell*, 832 F. App'x at 301–02; *cf. Wilson*, 153 F.4th at 488 ("Here, nothing suggests that any crime—or evidence of one—ever touched [the home searched]. . . . [T]he affidavit never explained why evidence from [the crime scene] would likely be found at [the home searched] . . . ."). Defendant's "bare-bones affidavit" and "insufficient nexus" arguments are unavailing.

### 2. *Misleading Statements & Omissions*

Defendant's post-hearing brief is largely dedicated to arguing that the good-faith exception does not apply because of (1) the bare-bones affidavit and (2) the insufficient nexus. (Doc. 144 at 3–5.) Defendant also suggests, however, that Scroggins *misled* Judge Sledge: "The affiant, who executed the search, knew . . . exculpatory surveillance details [i.e., that no narcotics had been seen or reported at the Stone Hill residence] yet omitted them, making reliance unreasonable." (Doc. 144 at 5 (citing *Leon*, 468 U.S. at 923); *see also id.* at 1; Doc. 46-2 at 1.)

Assuming that this statement triggers *Franks*, (*cf.* Doc. 146 at 3), Defendant must show: (1) that Scroggins "knowingly and intentionally, or with reckless disregard for the truth, omitted material information from the affidavit" and (2) that the affidavit "would have been insufficient to establish probable cause" had Scroggins included such information, *see Arispe*, 328 F. App'x at 907; *see also Brown*, 298 F.3d at 395 (discussing the *Franks* standard). "It is often difficult to prove

---

[5] Other facts in Scroggins's affidavit included: (1) EBRSO agents completed two controlled purchases of heroin from Defendant in the preceding three weeks. (Doc. 148 at 4.) And (2) EBRSO agents searched the Gentlebrook residence on April 13 (i.e., the same day as the search of the Stone Hill residence), at which time they found heroin and "a large quantity of U.S. Currency that was concealed inside a wall of the [Gentlebrook] residence." (*Id.*)

that omissions were made intentionally or with reckless disregard; therefore, '[i]t is possible that when the facts omitted from the affidavit are *clearly critical* to a finding of probable cause[,] the fact of recklessness may be inferred from proof of the omission itself." *United States v. Arispe*, No. 07-381, 2007 WL 9723486, at *4 (W.D. Tex. Nov. 2, 2007) (quoting *United States v. Martin*, 615 F.2d 318, 329 (1980)); *cf. United States v. Ortega*, 719 F. App'x 319, 325 (5th Cir. 2018) (per curiam) ("[T]he less damaging the whole truth is to the affiant, the weaker the inference that the affiant made a statement or omission with reckless disregard for the truth.").

Defendant has not met the above burden. In *Bell*, the Fifth Circuit reviewed a similar challenge to the good-faith exception, ultimately deeming it unpersuasive:

> Bell also suggests that we should not apply the good-faith exception because, he asserts, the affidavit deliberately omitted facts suggesting that [he] did not directly sell drugs at the Residence and that [he] may have resided at a different address. Those arguments fail. *The allegedly omitted facts can be easily inferred from the affidavit*, which said nothing about any drug sale at the Residence and merely identified that Bell's arrest records indicated that the Residence was his last known address. Those facts also do not undermine the affidavit's various observations directly tying Bell to the Residence; whatever other addresses he was associated with, the affidavit provided firm footing to conclude that he was at the Residence immediately prior to at least one drug transaction.

*Bell*, 832 F. App'x at 302 n.3 (emphasis added).

The same reasoning applies here: The omitted information can be easily inferred from the affidavit itself. (*See* Doc. 148 at 4.) Scroggins stated that LPSO agents "*believe[d]*" that Defendant was storing narcotics and/or proceeds at the Stone Hill residence based on surveillance and tracking, which revealed that Defendant traveled to the residence "[o]n multiple occasions," including after completing narcotics transactions. (*Id.* (emphasis added).) Nowhere did the affidavit suggest that LPSO agents ever saw or heard about narcotics at the Stone Hill residence. (*Id.*) Nor has Defendant shown that this fact is so "clearly critical" to the determination of probable cause that the failure to make it explicit (i.e., by including it in the affidavit) creates an inference

19

that Scroggins had a reckless disregard for the truth. *See Arispe*, 2007 WL 9723486, at *5 ("There is simply no evidence 'directly illuminating the state of mind of the affiant.' Additionally, the Court finds that the Defendant has failed to show that the omitted facts are clearly critical to a finding of probable cause." (quoting *Martin*, 615 F.2d at 329)).

Because Defendant has not overcome the "presumption of validity with respect to the affidavit supporting a search warrant," the good-faith exception to the exclusionary rule applies. *See Franks*, 438 U.S. at 171.

### B.  Probable Cause

The Fifth Circuit uses "a two-step test to determine whether to apply the exclusionary rule": (1) Does the good-faith exception apply? *Mays*, 466 F.3d at 342–43 (citing *United States v. Laury*, 985 F.2d 1293, 1311 (5th Cir. 1993)). (2) Was the warrant supported by probable cause? *Id.* If the good-faith exception applies, then step (2) is gratuitous, "unless the case presents a 'novel question of law whose resolution is necessary to guide future action by law enforcement officers and [issuing judges].'" *Mays*, 466 F.3d at 343 (quoting *Laury*, 985 F.2d at 1311). "Principles of judicial restraint and precedent dictate that, in most cases, [courts] should not reach the probable cause issue if a decision on the admissibility of evidence under the good-faith exception [to the exclusionary rule] will resolve the matter." *See Gallegos*, 239 F. App'x at 893 (internal quotation marks omitted) (quoting *United States v. Flanders*, 468 F.3d 269, 270 (5th Cir. 2006)).

For reasons already given, the Court finds that the good-faith exception applies here. *See* Section IV.A., *supra*. And the Court need only "apply established Fourth Amendment principles" in deciding Defendant's *MTS*. *Gallegos*, 239 F. App'x at 894. That is, the motion does not present any "novel question of law" requiring the Court to advance to step (2) of the Fifth Circuit's test (i.e., to consider whether the Stone Hill warrant was supported by probable cause). *See Mays*, 466

F.3d at 343 (quoting *Laury*, 985 F.2d at 1311). Consequently, the Court will not venture beyond its finding that the good-faith exception applies.

## V.    CONCLUSION

Accordingly,

Defendant's *Motion to Suppress* (Doc. 46) is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>November 21, 2025</u>.

 

 

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**